## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 14 2016, 8:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mary Beth Mock
Law Office of Mary Beth Mock
Madison, Indiana

ATTORNEY FOR APPELLEES

Jason J. Pattison
Jenner, Pattison, Sutter & Wynn, LLP
Madison, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Guardianship of S.S. and J.N., Minor Children,

Marla New,

*Appellant-Respondent*,

v.

Kenneth Scrogham and Teresa Scrogham,

*Appellees-Petitioners*.

October 14, 2016

Court of Appeals Case No. 39A01-1512-GU-2289

Appeal from the Jefferson Circuit Court

The Honorable Darrell M. Auxier, Judge

Trial Court Cause No. 39C01-1405-GU-23

**Brown, Judge.**

[1] Marla New ("Mother") appeals the trial court's order granting the petition for guardianship of her daughter, S.S., filed by S.S.'s paternal grandfather Kenneth Scrogham and his wife Teresa (collectively, the "Scroghams") and the denial of her motion to correct error. Mother raises four issues which we consolidate and restate as whether the court abused its discretion in granting the petition for guardianship. We affirm.

## *Facts and Procedural History*

[2] Mother and Robert Scrogham are the biological parents of S.S., born February 22, 2004.[1] Mother and Brent Hammons are the biological parents of J.N., born May 25, 2005.

[3] At some point, there were allegations that Mother had individuals staying at her home, that there was some sort of argument between one of those individuals and S.S., that someone pushed S.S., and that this person was still residing in the home. On April 22, 2014, Mother told Family Case Manager Dosha Campbell ("FCM Campbell") that her niece and her niece's boyfriend, Derrick Gotts, had been staying there "on and off," that Gotts pushed S.S., and that as soon as Mother found out about it she made her niece and Gotts leave the home because they had "the evil spirits." Transcript at 14-15. Mother made some "odd statements" regarding evil spirits and demons and said that she "would

---

[1] At the May 13, 2014 hearing, the Scroghams' attorney indicated that he had a waiver and notice of hearing and consent to guardianship signed by Robert Scrogham. At the time of the December 2, 2014 hearing, Robert Scrogham was incarcerated.

tell S.S. to get on the right of her because that's where the good spirits were were on the right." *Id.* at 15.

[4] The next day, FCM Campbell went back to Mother's home, and Mother said that she was going to church, made a comment that "the Calvary was coming behind her," she "just seemed really happy," and she talked about going to the ocean and washing the demons away from her. *Id.* at 16. FCM Campbell did not think that Mother was necessarily under the influence of anything, but "thought that things were just odd, maybe more in the mental health issue." *Id.* at 18. FCM Campbell performed a drug screen, and it was positive for marijuana.

[5] That same day, Pastor Peter A. Joudry, the lead pastor of Madison Assembly of God, was praying publicly when Mother, who had attended the church a few times and had been a part of a Bible study, came down the aisle with some feathers, shells, leaves, spice, and a package of cigarettes. Mother was dressed in "cowboy, western, maybe Indian dress" and was walking directly toward Pastor Joudry who stepped to the side. *Id.* at 7. Mother then walked by him, went onto the platform, sat cross-legged, and placed the items in front of her. Pastor Joudry asked her what she was doing, and Mother said that the devil was on the left and God was on the right and that she could prove it biblically. Pastor Joudry eventually asked Mother to take her seat, and Mother left the items on the platform and took a seat. Mother's back was turned to Pastor Joudry and it "seemed like she might have been doing some --- maybe some ritual thing or bowing or whatever." *Id.* at 8. Pastor Mia Tran eventually came

and escorted Mother into the lobby and Pastor Joudry "discerned at the time that . . . there may be some psychological issues . . . ." *Id.* at 9.

[6] On April 24, 2014, City of Madison Police Officer Brandon Decker was dispatched to Mother's townhouse regarding a "juvenile problem" around 9:00 p.m. after the neighbors called the police. *Id.* at 21. As he arrived, Officer Decker could hear screaming and it "sounded like a woman and children." *Id.* Officer Decker drew his service weapon, announced his presence, knocked, and entered the residence through an unlocked door. The lights of the residence were off, Officer Decker illuminated the room with his service pistol's mounted flashlight, and Mother calmly invited him inside.

[7] Officer Decker observed S.S. and J.N. sitting on the couch, and they "seemed to be plastered against the couch very fearful of the situation that was going on." *Id.* at 22-23. He asked if there was someone else in the residence, and Mother stated that she was "ridding the house of evils." *Id.* at 23. The children then became "extremely upset" and burst out in tears and were crying louder, and Officer Decker turned on the lights. *Id.* He observed that the children were not wearing shoes or socks and that there was a "glass casserole-type server at their feet full of water" sitting on a towel. *Id.* He found that "odd" and went to speak with Mother in the kitchen. *Id.*

[8] Mother told Officer Decker that "they were ridding the house of evils," and he asked her if she was on any type of medication because he could "kind of tell she was at an abnormal state-of-mind." *Id.* Mother told him that she was not

on medication, but said: "I smoked pot earlier today, but that was years ago." *Id.* at 24. Officer Decker noticed that there were trash bags containing school books, clothes, and an appliance, and that Mother had thrown away one shoe out of each pair of the children's shoes. Mother said that she was going to ride her pony to South Carolina to marry her Indian husband.

[9] Officer Decker asked the children about the pan of water, and they became upset and said that Mother had been repeatedly washing their feet and that Mother's "activity was scaring them." *Id.* at 25. Medical personnel arrived and took Mother to the hospital for a mental evaluation. The children were released to Kenneth Scrogham who was called to the scene.

[10] Family Case Manager Cynthia Adams ("FCM Adams") went to the scene and observed that the children were scared and crying. S.S. led FCM Adams to the kitchen to show her some of Mother's writings in four or five notebooks that contained "a lot of erratic-looking kind of writings, spiritual stuff . . . ." *Id.* at 32. FCM Adams did not "go through all the stuff, but there was apparently one of [S.S.'s] books that had a butterfly or something on it that [Mother] thought was evil and tore her text book up." *Id.* at 33. Mother spent the night at the hospital and then went to Clark County Behavioral Health where she stayed for eleven days.

[11] On May 5, 2014, Family Case Manager Daniel Hoffman ("FCM Hoffman") was contacted by someone who stated that the children had exited the bus or that Mother had taken the children off the bus and there were some concerns

about whether or not the children should be with Mother. FCM Hoffman arrived at Mother's house and spoke with her. Mother said that she had left the hospital at 11:00, that people do not understand her spiritual side, and that she can see things that other people cannot see. Mother was a "bit erratic" and was speaking "kind of fast," and "it was hard to kind of follow what she was saying." *Id.* at 48. The children seemed nervous. The principal from the children's school arrived and talked to Mother while FCM Hoffman took S.S. outside the home and spoke to her. S.S. broke down in tears and said that she was scared to be there, was "afraid this is all going to happen again," and that she thought that her Mother needed help. *Id.* at 47. FCM Hoffman felt uncomfortable for the children to be there. The principal exited the residence and indicated that she had talked with Mother and they had decided for the children to go with the grandparents.

[12] On May 7, 2014, the Scroghams filed a Petition for Appointment of Temporary Co-Guardians Over Persons and Estates of Minor.[2] On May 13, 2014, the court held a hearing on the petition. Pastor Joudry, FCM Campbell, Officer Decker, FCM Adams, Teresa Scrogham, and Mother testified.

[13] Mother testified that she was unemployed, received social security disability for agoraphobia, did not have a fiancé, and told people that she had an Indian fiancé because she feels like "there is someone for me out there and that he will

---

[2] The record does not contain a copy of the petition.

come, and I won't be alone to raise the kids all by myself anymore." *Id.* at 35. She testified that she is an Indian and that "[w]e rode our ponies out west and then we rode the iron horses back." *Id.* When asked why she was washing her children's feet, she stated that she was washing dirt off their feet and that it calmed them down. She said that J.N. was struggling and screaming and she may have raised her voice, and that she smokes marijuana "daily if I can." *Id.* at 36. She testified that she went to the church that day to let them know that she knows there is a God, she denied hearing voices or having hallucinations, and indicated that she was going to follow up with mental health counseling. She testified that she had a car but did not have a driver's license because she was working on paying some fines.

[14] Teresa testified that J.N. is not biologically related to her or Kenneth but that he has always known them as "ma-maw" and "pa-paw." *Id.* at 50. Teresa testified that S.S. lived with them in 2006 for about seven months and that there were other periods of time a couple of weeks here and there when Mother called them and said that she was out of food or that her electricity was turned off and asked them to take S.S. for a while so that S.S. "wouldn't be without." *Id.* at 52.

[15] At the end of the hearing, Mother testified: "I understand what you all are trying to do, and I'm so glad you're trying to help, and if the Judge feels like they need to stay with you a little longer that's fine with me." *Id.* at 61. The court granted a temporary guardianship.

[16] On August 7, 2014, the Scroghams filed a Petition for Appointment of Co-Guardians Over Persons and Estates of Minors.[3] On September 25, 2014, J.N. was returned to Mother following allegations by three of the Scroghams' young grandsons of acts between them and J.N. On November 17, 2014, the court entered an Agreed Order to Terminate Temporary Guardianship of J.N. and to Dismiss Petition for Permanent Guardianship Concerning J.N.[4]

[17] On December 2, 2014, the court held a hearing. Mother testified that she did not consider marijuana a drug, that she last smoked marijuana "probably---a month ago," and that she smokes it "occasionally" or "[o]nce a week, twice a week." *Id.* at 103. She stated that after being released from Clark County Behavioral Health, she was given Prozac and Zyprexa for depression and anxiety, took them for maybe a week, and then stopped taking them because she "just didn't feel right" and "[t]hey just weren't for" her. *Id.* at 109. She indicated that she followed up with Centerstone and had an initial therapy session on November 29, 2014, and then one other therapy session. She testified that she tried to contact Lifesprings, but they said she needed a referral. She also testified that she tried to contact DCS, but they said that they did not have a case on her so they could not refer her. She again denied having

---

[3] The record does not contain a copy of the petition.

[4] The record does not contain a copy of the agreed order.

delusions and when asked about what occurred at the church on April 23, 2014, with the "Indian ritual," she answered:

> I wouldn't call it an Indian ritual, but the best way to describe that is I felt like I needed to go over there, and that's the place you take things that you don't want on you anymore, and I had a spiritual experience then. I took them over there and uh--- exercised [sic] some demons if you---that's what happened.

*Id.* at 111. With respect to the washing of her children's feet, Mother testified that the "children's pastor of the church told me that when they get upset and they're tired, she said, 'Put water and oil on their feet and massage their feet, and it calms them down.'" *Id.* at 112. She also testified that she receives food stamps and that the children receive Medicaid. The court ordered that the temporary guardianship continue for the next ninety days.

[18] On June 25, 2015, the court held another hearing. Mother testified that she had been unemployed since 2010 and received disability for "[a]goraphobia and panic and anxiety." *Id.* at 274. She stated that she was diagnosed with PTSD and that her Centerstone records showed a long history of a bipolar diagnosis, but that she did not believe that she is bipolar. She testified that she first saw a mental health provider after she was struck from behind while riding a moped in 2010. She again denied ever having hallucinations or delusions, but conceded that her Centerstone records indicated that she had. She indicated that Clark County Behavioral Health discharged her after an eleven-day in-patient stay following the April 2014 incident and that they told her to follow up with her local community mental health provider, but she did not

immediately do so. She was discharged with two medications, Prozac and Zyprexa. She stated that she then did not receive any mental health treatment until she received an evaluation in November 2014 from Centerstone, that she agreed with the records indicating that she had been there eight times since then, and that she missed one appointment but did not recall why. She also testified that she was currently on Paxil and Trazadone, that if S.S. was returned to her, she would continue to seek mental health treatment, and that she had not used marijuana since January 2015.

[19] She testified that she still did not have a driver's license and had only twenty-five dollars left to pay before she could be reinstated in Indiana and also acknowledged that her driving record indicates that she has at least $375 in reinstatement fees.[5] She also acknowledged that she had thrown away a working PlayStation.

[20] Guardian ad litem Marita J. Berry ("GAL Berry") testified that she was first assigned the case in August 2014. When asked what was in S.S.'s best interest, GAL Berry testified that S.S. does much better with her grandparents and that S.S. has never wavered in her statement that she is afraid of the things Mother does and is still afraid to be at her Mother's home. As for J.N., GAL Berry testified that she last saw him a week earlier, that he was clean, seemed to be

---

[5] Mother stated: "after I pay the 25-dollar fine I'll be eligible to be reinstated. You have to pay the 25 before you can get started on the 380." Transcript at 306. She later stated: "Once the 25 dollars is paid over here---or, no, that doesn't even apply." *Id.*

doing fine, and was happy to be with Mother. When asked about whether Mother was going to physically harm S.S., GAL Berry stated that "S.S. has told me every single time that [Mother] flies into a rage, she beats her chest, she screams, and that terrifies S.S. Now that's not physical, but that's certainly emotional abuse, and that is in my report." *Id.* at 326.

After the Scroghams rested, Mother testified that she identified as being a Native American member of the Miami tribe, that she practiced a mixture between Native American spirituality and Christianity, that she believed in the Bible, God, the devil, and demons, and explained the purpose of tobacco and sage in Native American culture.

On October 29, 2015, the court granted the petition for guardianship and ordered that Mother have parenting time with S.S. pursuant to the Indiana Parenting Time Guidelines in a very detailed, nineteen-page order which states in part:

FINDINGS OF FACT

* * * * *

17. On April 24, 2014, Brandon Decker, a Madison Police Department officer, was dispatched to Mother's home in response to a disturbance call. Upon arriving he could hear screaming coming from a downstairs open window of Mother's home. The screaming was so loud that he could hear it while still seated in his patrol car. Decker knocked and announced his presence but received no response. He then made entry into the home and discovered Mother, S.S. and J.N. in the living room.

The children were the source of the screaming. Both children appeared to be very fearful and "plastered" to the couch. Decker asked Mother what was going on and she replied that she was ridding the house of evil. The children then got extremely upset and began crying. Decker observed that the children did not have shoes and socks on and that there was a pan of water and a towel on the couch. Mother did not seem normal and Decker asked her if she was on medication. She replied that she had smoked marijuana earlier that day but that was years ago. She told Decker that she was removing all evil items from the house. There were garbage bags filled with belongings in the home. Textbooks, toys, medicine, and a playstation were some of the items being thrown away. One shoe out of every pair was thrown away and shoelaces were thrown away because they were evil. Mother later testified that the kids were screaming because she was throwing away their toys and that she could do this because she bought the toys. She also testified that she threw the playstation away because the kids were always fighting over it. The Court concludes that Mother was throwing away the items under the delusional belief that they were evil. Mother also informed Decker that she was going to ride a pony to South Carolina to marry her husband.

* * * * *

20. On April 24, 2014, after the incidents observed by Officer Decker, Mother was admitted to Clark County Behavioral Health for 11 days. In Mother's words she was "overwhelmed" with life in general. She was released from Clark County Behavioral Health with instructions to follow up with a local mental health provider for therapy and prescriptions for medication. Mother had been prescribed Prozac and two other drugs but she stopped taking them without a doctor's approval.

21. Mother then went to Centerstone, a mental health center, for counseling for PTSD and anxiety. She had attended eight

appointments as of the time of the last hearing. She has made some progress towards her goals of not yelling and screaming and being better able to interact with her children. Marita Berry, the GAL, who has been actively involved in this case for approximately 10 months, has observed no significant changes in Mother's situation.

22. Mother suffers from Bipolar II disorder, cannabis use disorder, panic disorder, and posttraumatic stress disorder. She also suffers from agoraphobia which makes it difficult for her to leave her house. She is frequently stressed, restless, easily distracted, sometimes depressed, moody, and fearful. She angers easily and has frequent arguments with others. As noted by her therapist on November 5, 2014, she has a history of manic phases becoming psychotic with very odd behaviors and of non compliance with medication.

23. On the date Mother was released from Clark County Behavioral Health, she was visited by DCS caseworker, Dan Hoffman. Mother told him she could see things other people couldn't see. He talked to the children alone and S.S. told him she was scared to be there and thought Mother needed help.

24. In the 2013-2014 school year, when the children were living [w]ith Mother, S.S. missed 22 and J.N. missed 18 days of school. The absences were due to Mother not getting them up in time to catch the school bus. During the 2013-2014 school year S.S. was very emotional; had a hard time making and keeping friends; got into arguments with other students easily; and despite being a diligent student, her homework completion was sporadic. During the 2014-2015 school year, when she was residing with the Scroghams, S.S. only missed 2 to 3 days of school. Her grades were better; she was more stable emotionally; and she was making and keeping friends much easier. She was involved in activities and her maturity level increased a lot.

25. S.S. is adamant that she wants to continue living with the Scroghams. She feels unsafe when living with Mother and does not like the screaming and cursing that goes on there. She has threatened to run away if she is returned to Mother's care. She is also afraid of Mother's behavior concerning Indian rituals. As of January 26, 2015, Mother had started to do the "Indian thing" again. Mother maintains that S.S. shouldn't be afraid when Mother talks about her Indian stuff. During S.S.'s visits with Mother, J.N. gets into S.S.'s face and yells motherf_cker. S.S. asks Mother to make him stop. Mother laughs and tells J.N. to stop but he doesn't. S.S. can't sleep well at Mother's home and she has bad dreams. Mother has told S.S. not to tell anyone what happens when she is there for a visit. S.S. is emotional, upset, and cries sometimes after her visits with Mother.

26. Mother has inappropriately discussed the instant case with S.S. Mother sat her in a chair and made her read the guardian ad litem's report while Mother thumped her chest and swore. Mother made S.S. agree that she wanted to come back and live with her before she could get up out of the chair. S.S. started agreeing with her so she would stop yelling at her.

27. Mother is consumed with hate for the Scroghams. She has repeatedly made negative comments about them to and in the presence of S.S. Mother constantly screams about the Scroghams and calls them terrible names. S.S. asked Mother to stop calling the Scroghams names but Mother replied, "It's impossible to not talk about what they are doing". Mother has also been angry, belligerent, and threatening to the Scroghams during many of the visitation exchanges, all of which occurred in front of S.S.

28. Mother exhibits poor anger control and has a history of screaming and cursing at the children. Despite therapy to address the same, her behavior has only been somewhat better.

29. S.S. has a strong bond with the Scroghams. Despite this bond, it is Mother's intention to move to Kentucky and to not allow the Scroghams to see S.S. in the event that she regains custody.

30. Mother has taken several other inappropriate and irresponsible actions such as the following:

> (a) Mother has allowed homeless persons to reside in the home with the children;

> (b) Mother has had S.S. use her own money to buy cigarettes from a neighbor;

> (c) During a home visit, Mother took the children to Wal Mart at 1:00 a.m. to get cigarettes. She accepted a ride home with a stranger. The children were afraid because Mother did not know the man;

> (d) At the start of this action Mother smoked marijuana on a daily basis. While she may have ceased use since, she still maintains that marijuana is not an illegal drug but is rather a medicinal substance; and

> (e) Mother smokes in the home when S.S. is present despite the fact that the smoke makes it difficult for S.S. to breathe.

31. J.N. was nine years old when the temporary guardianship was granted. Mother had never taken J.N. to a dentist. J.N. had extensive dental work done while living with the Scroghams.

32. J.N. expressed his desire that he live with his mother citing as a reason that the Scroghams had too many rules. He was

placed back in Mother's care in mid-November of 2014. As of December 12, 2014, Mother was having difficulty parenting J.N.

33. Kenneth and Teresa Scrogham have been married for twenty nine years and have lived in the same home during their entire marriage. Teresa works second shift as a human resource specialist. She has been consistently employed for more than two decades. Kenneth is disabled and serves as a stay at home mom for his four grandchildren. Neither of the Scroghams have a criminal history, mental health issues, or substance abuse issues.

34. The Scroghams have been actively involved in S.S.'s life since her birth. They have regularly celebrated holidays and birthdays with S.S. and have taken her to church. On several occasions, S.S. has stayed with them for several weeks due to Mother having no food or no electricity. On one occasion, S.S. lived with them approximately six months due to Mother having no electricity. When S.S. was living with Mother, Mother would frequently call Teresa for assistance with disciplining the children. Teresa would discipline the children over the telephone. [Mother] commented that "these kids are driving me crazy".

35. S.S. is thriving while living with the Scroghams. She has structure and boundaries in the home. She has chores to do and enjoys being responsible. Her school attendance has improved dramatically and she is making excellent grades. She is more stable emotionally and is making and keeping friends much easier than she did while residing with Mother. She feels safe living with the Scroghams and she is adamant that she wants to continue to live with them.

DISCUSSION AND CONCLUSIONS OF LAW

* * * * *

38. Before placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement. Id[.]

39. The trial court must be convinced that placement with a person other than the natural parent represents a substantial and significant advantage to the child. The presumption will not be overcome merely because a third party could provide the better things in life for the child. Id[.]

* * * * *

41. In the present case, the strong and important presumption that S.S.'s interests are best served with placement with Mother has been clearly and convincingly overcome by the facts set forth above and S.S.'s best interests are substantially and significantly served by placement with the Scroghams.

42. Such facts are more fully discussed as follows:

> (a) Mother lacks the ability to appropriately discipline S.S. In the past, she has had to turn to Teresa Scrogham for assistance in disciplining the children. Presently, her method of discipline is to yell and curse at the children. Little improvement has occurred despite the fact Mother has been in therapy. This is hardly surprising since Mother has a history of angering easily and having frequent arguments with others. It is not in S.S.'s best interests to be exposed to Mother's yelling and cursing.

> (b) Mother has placed S.S. in the middle of this controversy and has inappropriately attempted to influence S.S. Mother forced S.S. to read the guardian ad litem's

report. While S.S. was reading the report, Mother screamed and cried that the report was a lie; accused S.S. of lying to the GAL; and stated that she thought S.S. hated her. She sat S.S. in a chair and made her agree that she wanted to come back and live with her before she could get up out of the chair. The above actions evidence extremely poor judgment on Mother's part. Mother either does not understand the harmful effects of her behavior on S.S. or, if she does understand, does not care.

(c) Mother has inappropriately disparaged the Scroghams in the presence of S.S. S.S. is very attached to the Scroghams and does not want or need to hear Mother's negative comments. She has asked Mother to stop making such remarks but Mother persists and finds it impossible to not talk about what the Scroghams are doing. Mother has also been angry, belligerent, and threatening to the Scroghams during many of the visitation exchanges, all of which occurred in the presence of S.S. Here again, Mother has engaged in inappropriate behavior which is harmful to S.S. Lastly, it is Mother's intention that S.S. will never see the Scroghams again if S.S. is placed in her custody. The Scroghams have played an important role in S.S.'s life and S.S. has a strong bond with the Scroghams. It would not be in S.S.'s best interest to sever such bond.

(d) Mother may very well be of Indian heritage. She has, however, demonstrated delusional thoughts in connection therewith. Despite her statements to the contrary, Mother does not have an Indian husband waiting for her in South Carolina. Mother has also attributed evil properties to the children's belongings and took steps to throw the belongings away to rid her home of evil. The children were frightened by Mother's behavior. The issue here is not whether Mother's Indian heritage and her actions in connection therewith are legitimate exercises of religion

but rather what effect the same have on S.S. S.S. and J.N. were obviously very frightened by Mother's excessive washing of their feet. Mother maintains that she was doing so in order to comfort the children but Mother lacked the insight to see that her actions were actually upsetting the children rather than calming them. Despite the fact that S.S. is afraid of Mother's Indian rituals, Mother started the "Indian" stuff again in early 2015. She sees no reason that S.S. would be afraid of her talking about her Indian stuff.

* * * * *

44. The presumption that it is in the best interests of S.S. to be in the custody of Mother is further overcome by the fact that S.S. is afraid of going back to live with Mother. She does not like the screaming and cursing that goes on in Mother's home and she is afraid of Mother's Indian rituals. She cannot sleep well at Mother's home and she has bad dreams. S.S. is emotional, upset, and often cries after her visits with Mother.

45. The Scroghams have established, by clear and convincing evidence, that S.S.'s best interests are substantially and significantly served by placement with the Scroghams. The Scroghams have been actively involved in S.S.'s life since her birth. S.S. has a strong bond with the Scroghams and is thriving in their care. She has structure and boundaries in the home. She has chores to do and enjoys being responsible. Her school attendance has improved dramatically. Her grades have also improved. She is more stable emotionally and she is making and keeping friends much easier.

Appellant's Appendix at 13-28.

On November 20, 2015, Mother filed a motion to correct errors, which the court denied.

## Discussion

The issue is whether the trial court abused its discretion in granting the petition for guardianship. "All findings and orders of the trial court in guardianship proceedings are within the trial court's discretion." *In re Guardianship of J.K.*, 862 N.E.2d 686, 690 (Ind. Ct. App. 2007) (citing Ind. Code § 29-3-2-4). Thus, we will review those findings under an abuse of discretion standard. *Id.*; *see also In re Guardianship of B.H.*, 770 N.E.2d 283, 288 (Ind. 2002) ("Child custody determinations fall squarely within the discretion of the trial court and will not be disturbed except for an abuse of discretion."), *reh'g denied*. In determining whether the trial court abused its discretion, we look to the trial court's findings of fact and conclusions thereon. We may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000), *reh'g denied*. In our review, we first consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard*, 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather we consider

the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind. 1999); *see also B.H.*, 770 N.E.2d at 288.

[25] Ind. Code § 29-3-5-1 provides that "[a]ny person may file a petition for the appointment of a person to serve as guardian for [a] . . . minor under this chapter or to have a protective order issued under IC 29-3-4." Ind. Code § 29-3-5-3 provides:

> (a) Except under subsection (c), if it is alleged and the court finds that:
>
> > (1) the individual for whom the guardian is sought is . . . a minor; and
> >
> > (2) the appointment of a guardian is necessary as a means of providing care and supervision of the physical person or property of the . . . minor;
>
> the court shall appoint a guardian under this chapter.
>
> * * * * *
>
> (c) If the court finds that it is not in the best interests of the . . . minor to appoint a guardian, the court may:
>
> > (1) treat the petition as one for a protective order and proceed accordingly;
> >
> > (2) enter any other appropriate order; or

(3) dismiss the proceedings.

"Indiana courts have long held that '[e]ven when a parent initiates an action to reobtain custody of a child that has been in the custody of another, the burden of proof does not shift to the parent . . . [r]ather, the burden of proof is always on the third party.'" *In re K.I.*, 903 N.E.2d 453, 460 (Ind. 2009) (quoting *J.K.*, 862 N.E.2d at 692). We have previously recognized that a reason for placing the burden on the third party is to encourage parents who are experiencing difficulties raising children to take advantage of an available safety net such as a grandparent who is willing to accept temporary custody of a child. *J.K.*, 862 N.E.2d at 692 n.2 (citing *In re Guardianship of L.L.*, 745 N.E.2d 222, 233 (Ind. Ct. App. 2001), *trans. denied*).

The Indiana Supreme Court has previously held:

> [B]efore placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement. The trial court must be convinced that placement with a person other than the natural parent represents a substantial and significant advantage to the child. The presumption will not be overcome merely because "a third party could provide the better things in life for the child." In a proceeding to determine whether to place a child with a person other than the natural parent, evidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person, would of course be important, but the trial court is not limited to these criteria. The issue is not merely the "fault" of the natural parent. Rather, it is whether the important and strong presumption that a child's interests are best served by placement

with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person.

*K.I.*, 903 N.E.2d at 458 (quoting *B.H.*, 770 N.E.2d at 287 (citations omitted)).

[28] Mother argues that: (A) her due process rights were violated; and (B) there was insufficient evidence to grant the petition and the court failed to find that the guardianship was necessary.

A. *Due Process*

[29] Mother argues that the United States Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054 (2000), and the Fourteenth Amendment are incompatible with the Indiana line of cases allowing the presumption that a parent is acting in the best interest of the child to be overcome solely based on the child's best interests. She also argues that Indiana's reliance on the significant and substantial best interests of the child in lieu of a showing of unfitness, abandonment, or long acquiescence violates a parent's Due Process rights under the Fourteenth Amendment to the United States Constitution. The Scroghams argue that Indiana's approach to the standard necessary to implement a guardianship is above and beyond that necessary to satisfy due process.

[30] In *Troxel*, Tommie Granville, the mother of two children, opposed a petition for visitation filed by the paternal grandparents of the children. 530 U.S. at 60, 120 S. Ct. at 2057. The Court addressed a Washington statute that provided: "Any

person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances."[6] *Id.* at 61, 120 S. Ct. at 2057-2058. The Court was asked to decide whether the statute as applied to a mother and her family violated the Federal Constitution. *Id.* at 65, 120 S. Ct. at 2059.

[31] The plurality noted that the Fourteenth Amendment provides that no State shall deprive any person of life, liberty, or property, without due process of law, that the Clause guarantees more than fair process, and that the Clause also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests. *Id.* at 65, 120 S. Ct. at 2059-2060.

[32] The plurality held that the Washington nonparental visitation statute was "breathtakingly broad," that the statute's language "effectively permits any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review," and that "[o]nce the visitation petition has been filed in court and the matter is placed before a judge, a parent's decision that visitation would not be in the child's best interest is accorded no deference." *Id.* at 67, 120 S. Ct. at 2061. The plurality concluded that the Washington Superior Court "failed to accord the determination of

---

[6] Justice O'Connor announced the judgment of the Court and delivered the opinion, in which Chief Justice Rehnquist, Justice Ginsburg, and Justice Breyer joined. 530 U.S. at 60, 120 S. Ct. at 2057.

Granville, a fit custodial parent, any material weight" and that the statute, as applied, was unconstitutional. *Id.* at 72, 120 S. Ct. at 2063.

[33] Here, we cannot say that the Indiana statute is "breathtakingly broad." The "the best interest standard is applicable in guardianship cases involving custody of a minor." *E.N. ex rel. Nesbitt v. Rising Sun-Ohio Cnty. Cmty. Sch. Corp.*, 720 N.E.2d 447, 451 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*; *see also* Ind. Code § 29-3-5-3(c) ("If the court finds that it is not in the best interests of the . . . minor to appoint a guardian, the court may: (1) treat the petition as one for a protective order and proceed accordingly; (2) enter any other appropriate order; or (3) dismiss the proceedings."). Further, Ind. Code § 29-3-5-3 provides that a trial court may appoint a guardian to a minor if "the appointment of a guardian is necessary as a means of providing care and supervision of the physical person or property of the . . . minor." This court has previously observed that the term "necessary" is not defined by the guardianship statute, and that two definitions of the word are "1. Absolutely essential . . . . 2. Needed to achieve a certain result or effect . . . ." *E.N.*, 720 N.E.2d at 452 (quoting THE AMERICAN HERITAGE COLLEGE DICTIONARY 911 (3rd ed. 1993)). Further, unlike the trial court in *Troxel*, the trial court here observed that Indiana recognizes "the important and strong presumption that a child's best interests are ordinarily served by placement in the custody of the natural parent," that the burden of overcoming the presumption is on the third party seeking custody, and that the presumption will not be overcome merely because a third party could provide

the better things in life for the child. Appellant's Appendix at 23. We cannot say that reversal is warranted based upon *Troxel*.

[34] To the extent Mother argues that Indiana's reliance on the significant and substantial best interests of the child in lieu of a showing of unfitness, abandonment, or long acquiescence violates a parent's Due Process rights under the Fourteenth Amendment to the United States Constitution, we observe that the Indiana Supreme Court discussed these factors in *B.H.* In that case, the Court observed that this Court restated the considerations expressed in *Gilmore v. Kitson*, 165 Ind. 402, 74 N.E. 1083 (1905), and had stated that to rebut the presumption that it will be in the best interests of the child to be placed in the custody of the natural parent "it must be shown by the attacking party that there is, (a) unfitness, (b) long acquiescence, or (c) voluntary relinquishment such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child." 770 N.E.2d at 286 (quoting *Hendrickson v. Binkley*, 161 Ind. App. 388, 393-394, 316 N.E.2d 376, 380 (1974), *cert. denied*, 423 U.S. 868 (1975)). The Court went on to hold, that "[i]n a proceeding to determine whether to place a child with a person other than the natural parent, evidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person, would of course be important, but the trial court is not limited to these criteria." *Id.* at 287. In other words, the Court held that "the trial court is not limited to the three *Hendrickson* factors." *Id.* at 288. It further held that the trial

court's "detailed findings provide ample support for the judgment of the trial court in granting the stepfather's guardianship petition," and that "the trial court was clearly convinced that placement with the stepfather represents a substantial and significant advantage to the children." *Id.*

[35] The trial court in this case noted the "important and strong presumption that a child's best interests are ordinarily served by placement in the custody of the natural parent," that "[t]he burden of overcoming the presumption is on the third party seeking custody," and that "[b]efore placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement." Appellant's Appendix at 23. The court also noted it "must be convinced that placement with a person other than the natural parent represents a substantial and significant advantage to the child," and that the "presumption will not be overcome merely because a third party could provide the better things in life for the child." *Id.* at 23-24. Under the circumstances, we cannot say that Mother was deprived of due process.

B. *Sufficient Evidence*

[36] Mother argues that there was insufficient evidence to grant the petition and asserts that the circumstances surrounding the temporary guardianship have been remedied. She points out that J.N. was returned by the Scroghams on September 25, 2014, and has remained in her care without incident. She contends that the court's determination is unconstitutional to the extent it based

its decision on her Native American and Christian beliefs, and that there is no law against adults smoking in the presence of their children in Indiana. She asserts that, contrary to Paragraph 42 of the court's order, she did know that J.N. needed to see a dentist and had an appointment to take him to the dentist in April 2014 and that there is no evidence to support Finding 32 that she was having difficulty parenting J.N. as of December 12, 2014. Mother also argues that the trial court erroneously awarded the Scroghams guardianship without a showing or finding that the guardianship was necessary as required by statute.

[37] The Scroghams assert that the evidence supports the findings and the findings support the conclusion. The Scroghams also argue that a trial court's failure to include a specific finding on necessity will not be grounds for reversal if it is implicit in the findings and the findings support the conclusion that the guardianship is necessary.

[38] As for Mother's argument that the court based its decision on her religious beliefs, we observe the trial court's statement that Mother "demonstrated delusional thoughts in connection" with her heritage and that "[t]he issue here is not whether Mother's Indian heritage and her actions in connection therewith are legitimate exercises of religion but rather what effect the same have on S.S." Appellant's Appendix at 26-27. We cannot say that the trial court based its decision on Mother's religious beliefs.

[39] With respect to her smoking, the court found that "Mother smokes in the home when S.S. is present despite the fact that the smoke makes it difficult for S.S. to

breathe." *Id.* at 21. GAL Berry's report filed on June 19, 2015, states that S.S. said Mother "is still smoking inside the apartment and it hurts her to breathe smoke." *Id.* at 43. Further, GAL Berry testified that S.S. "would get a headache from the smoke in the house . . . ." Transcript at 322. We cannot say that this finding is clearly erroneous.

[40] As for the court's statement that J.N. did not go to a dentist until the Scroghams took him during their temporary guardianship and that Mother knew or should have known that he was in need of dental work, we observe that Teresa testified that she noticed J.N. had atrociously bad breath, that she looked in J.N.'s mouth and saw a "very rotten tooth," that she asked him if he had ever been to a dentist, that J.N. said "No," and that J.N.'s teeth were "in such bad shape because of having never been to a dentist in his life . . . ." *Id.* at 143, 145. GAL Berry testified that she noticed some discrepancies between what Mother had told her and Mother's testimony. When asked about the discrepancies, GAL Berry stated:

> One of them was when I asked her, 'Have the kids ever been to a dentist?' She said, 'No,' but she had had an appointment for J.N. but it was not until the spring and that was like four or five months after his surgery that he had. That was the first time that she had uh---had a dentist appointment for him.

*Id.* at 321. We cannot say that the court's finding is clearly erroneous.

[41] Mother does not specifically argue that the evidence fails to support a number of the court's findings including that she stated that she was "overwhelmed"

with life in general in April 2014, she stopped taking prescriptions without a doctor's approval after being released from Clark County Behavioral Health, she suffers from Bipolar II disorder, cannabis use disorder, panic disorder, PTSD, and agoraphobia, that S.S. missed 22 days and J.N. missed eighteen days of school when they were living with Mother during the 2013-2014 school year because Mother did not wake them in time to catch the school bus, and that S.S. was scared to be with her, felt unsafe with her, and did not like the screaming and cursing that occurs in her house. Additionally, Mother does not contend the evidence fails to support the finding that her method of discipline is to yell and curse at the children, that S.S. is emotional, upset, and cries sometimes after her visits with her, that S.S. missed only two to three days of school during the 2014-2015 school year when residing with the Scroghams, and that S.S. is thriving and feels safe with them.[7]

[42] We note that some of these findings relate to circumstances present at the time of the hearing. GAL Berry filed a report on June 19, 2015, and indicated she performed a home visit with S.S. who told her that Mother made her go to a neighbor's house and buy cigarettes for her with S.S.'s money, Mother was "still smoking" inside the apartment, Mother constantly screams about the Scroghams, the dynamics of Mother's home continues to be unchanged, and

---

[7] Mother asserts that it is bad public policy to base an award primarily on her mental health issues. We cannot say that the trial court granted the petition for guardianship based only upon Mother's mental illness.

that S.S. is still afraid to go back and live with Mother. Appellant's Appendix at 43.

[43] To the extent Mother argues that the trial court erroneously awarded the Scroghams guardianship without a showing it was necessary as required by statute, we have previously held that "a trial court's failure to include a specific finding on necessity will not be grounds for reversal if it is implicit in the trial court's evidentiary findings." *Hinkley v. Chapman*, 817 N.E.2d 1288, 1291 (Ind. Ct. App. 2004) (citing *E.N.*, 720 N.E.2d at 452). As discussed, the trial court entered a nineteen-page order with detailed findings. We conclude that implicit in these findings was the finding that the guardianship was necessary. *See id.* ("Implicit in these findings is the trial court's finding that the appointment of the Chapmans as guardians was necessary, i.e., absolutely essential or needed to rectify L.B.'s educational deficiencies. Therefore, we do not reverse the trial court's determination for the absence of a specific finding.").[8]

[44] We affirm the decision of the trial court.

Robb, J., and Mathias, J., concur.

---

[8] Mother argues that this case is similar to *In re Guardianship of L.L.*, in which we reversed and remanded with instructions to terminate a guardianship. 745 N.E.2d at 233. We observed that "there is absolutely no indication that [the mother] is presently an unfit parent," that it was undisputed the mother had been successful in raising another child during the previous six years, that the custody evaluator's report spoke of the mother's parenting capabilities only in positive terms, and that the evaluator expressly testified that she believed the mother was capable of taking care of both children. 745 N.E.2d at 231. The circumstances in *L.L.* are not present here.